Good morning, Your Honors. Good morning. You may proceed. Thank you. Good morning, Your Honors. May it please the Court, my name is Luis Cortez, pro bono counsel for the petitioner. I would like to reserve two minutes for rebuttal, and I will be sharing my time evenly with our amici counsel. Your Honor, there are two main issues that I want to touch upon here. The first one is the agency's findings with respect with social distinction in their analysis of the particular social group, and the second one is the agency's findings with respect with the specific intent requirement of the Convention Against Torture claim. So starting with the social distinction prong of the particular social group, there are two points that I want to make on that matter. First is that the, and I think as a foundational matter, it's important to point out that our particular social group that was specified to the agency and to the immigration judge was indigent Mexicans without familial support and with chronic and perceptible mental illness involving psychosis and with mental disabilities. And so the issue narrowed down to with the immigration judge, whether they were, whether they have social distinction in Mexico. And here, Your Honor, one of the first things that I want to focus on is that on page 204 and page 205 of the record, it indicates how the immigration judge focused on the lack of legislation that there was to focus on this particular group. In fact, they said that there are, that there is legislation that focuses on protection of individuals' mental health, mental health issues, but not with this particular group. And Your Honor, we feel that this inconsistent with the board's precedent. And one of the cases that highlight that is matter of ARCG. In matter of ARCG, on page 388 of the decision, it held that married women who are unable to leave a domestic relationship in Guatemala constitute a particular social group. And in doing so, it did focus on some of the legislation involved in Guatemala, but it did so within the domestic violence laws. It didn't talk about married women, it didn't talk about whether they were able to leave or not in a domestic setting. They talked about the domestic violence laws that are in place in Guatemala amongst a few other contexts. And so here, the immigration judge's reliance on saying, well, the laws that are protecting individuals' mental health issues protects a variety of individuals and not this particular class, and therefore there's no social distinction, is just unsupported and is contrary to the board's decision. Well, you know, the fact that you have legislation that protects one thing has never precluded us from finding a protected class or, you know, a social group in a number of other settings, correct? Correct. So is, what, what force of law would having or not having legislation have? Well, I think that's, I appreciate the question, Your Honor, and I think even absent legislation, the mere fact that there's government recognition of a class of individuals should be sufficient to show that this particular social group exists. And on page 204 of the record, the immigration judge specifically indicated that the Mexican government recognizes this particular types of individuals. In fact, the types of individuals that she mentioned that the government recognizes are individuals with mental health, specifically, she said, in the 2010 D.R. reports, the mental health professionals who are part of the Mexican government, because it's a public health care system, recognizes members of the Mexican society who identify, classify as mentally ill individuals on whether or not they have familial support, and they also suffer from mental disability, but no one else does. And so outside of these mental health professionals who work for the government, her position is that no one else in society does. But we think that that is one of the main points. The fact that the Mexican government actually does recognize them should be a strong indicator, and, Your Honor, the focus on legislation would be a test that would be unworkable, because certainly sometimes the lack of legislation would be part of the persecution in some instances. So focusing on the legislation itself should not be the only test, and the fact that there was government recognition here, it should be a strong indicator that this group exists. And though now his family said they would help him, correct? The brother said that he would try to provide financial support to him, yes. So then how does that suggest that he's without familial support? Because the familial support within this context, Your Honor, is the type of support that would prevent him from being institutionalized. And so it would require a consistent care for him, and if he can provide money, that doesn't necessarily mean that he wouldn't be institutionalized there. And so there's testimony in the record that indicated that he had support from other individuals when he was here, and even here he was having a difficult time. And so the immigration judge also focused on that as well, saying, you know, the family, or his brother's going to be able to financially help him, but, you know, that's not the type of familial support that we're looking at here. Has he ever been institutionalized? I'm sorry. No, that's my question. Has he ever been institutionalized? Not in a mental institution, Your Honor, but, I'm sorry. Well, my next question is, isn't it true that something like less than 10 percent are institutionalized in Mexico? Well, Your Honor, I will make two points with respect to that. The first one is, the petitioner has been here for several years, and recently he was held at the detention center, and then he was released on bond. And while he was released on bond, he was arrested again for a criminal act, and part of that was because he was not taking his medicine anymore, and he's now back in detention, and he's been there for four years. And the second point— But he's in criminal detention, not mental health detention. No, Your Honor, it's civil detention. He's held by the immigration authorities, and so he's held by civil detention. And, you know, any request to be released has been denied because he's considered a danger to the community at this point, given his criminal background. That stemmed from the mental health medication, and I think that underscores our argument, Your Honor, because the statistics show that 10% might be institutionalized at the time of the report was made. It doesn't highlight the type of individuals that those 10% comprised of, and the two factors that I want to focus on that is, we're seeing that with him now within the immigration setting, and he also testified that his father was institutionalized when the family called the police against the severe domestic violence, and he kept being brought over to the mental health institution because of the Father's Criminal Act. So our position is that his particular characteristics in his mental health would lead him to get institutionalized and would be within those 10% who might be institutionalized. I mean, that's a pretty speculative connection, where you have someone who's never been institutionalized except for criminal conduct, to suggest that worry to be returned, that somehow, because there is a small percentage of the population that can be detained in mental institutions, that he would be when he never has been before. I'm just having trouble. That's a pretty big leap. Do you have any case or anything that would allay our concerns on that point? On the fact that he hasn't been institutionalized before, and so he ... Right. I mean, it's saying, but we think he would be, and therefore he would be a risk. I don't know how we connect the dots without either some evidence or some case that says, well, those kind of circumstances let you somehow meld speculation together to get something concrete in terms of particularized concern. I don't believe there is speculation for a variety of reasons. When we're looking at the record, starting off with his personal experiences with his being institutionalized were due to criminal acts, which we have seen from the petitioner here when he has not taken his medication. That is one example where our position is that it's not speculative. The second point to that, Your Honor, is that the record also indicates that the mental institutions are one of the few places where you can get medication that he needs, so he's going to have to go there anyway. In fact, his brother was able to get medications for him. Isn't that true? Excuse me, Your Honor? His brother was able to get medications for him as an outpatient. Isn't that true? Here in the United States, Your Honor, and I think that highlights our point because here in the United States he was able to get medication without going to a mental institution and being able to stay out of that. In Mexico, the record indicates that he would have to go to a mental institution to get this medication. According to my notes, at AR 378, he was able to get medication in Mexico as an outpatient. Am I wrong? I don't believe that's correct, Your Honor, because he was diagnosed here in the United States and the brother didn't know about his mental health situation until it was disclosed to him once he was in immigration detention. So I will double check that part of the record, Your Honor, but I don't believe that's correct. So let me get this straight. You're saying that even though the medication is available in Mexico, in order to receive it you must be in a mental institution? I think it has to be. The mental institutions are the ones who are able to give it to him. And so he would have to . . . Where in the record does it say that? I will try to find the site on the record and I can get it in rebuttal. Why don't you do this? Why don't you take a moment and find that because you wanted to give some time to the amicus as well. I do. Can I make one quick point? You're fine, but you're down to five minutes. Yes, I'll make one quick point and then I'll sit down and reserve the rest of my time for rebuttal. I want to make one quick point with respect to CAT, Your Honor. This case is not about a lack of resources case and I think that's one of the things that we really want to highlight as part of the CAT analysis. Your Honor, this case is about a continued systematic approach of the Mexican government to continue to torture individuals with mental health issues. And the two strongest things that we have on the record, Your Honor . . . The two strongest points we have on the record, Your Honor, is on page 526 of the record where it talks about the persistent use of involuntary lobotomies and yet it says that there's no laws that provide necessary protection against the abuse of psychosurgery. Page 566 and 557 of the record also indicates that the Mexican government has denied access to independent investigators regarding the mental health facilities and to monitor the progress that has been going on. And I want to point that specifically out and then I will reserve the rest of our time. The immigration judge found that because the Mexican authorities continue to have transparency and access, that's one of the things that she pointed to to say that there continues to be some progress and try to tether the case next to Villegas. But that is clearly wrong and the record supports that on 566 and 567. And these two parts of the record indicate that it's not a lack of resources. This has nothing to do with lacks of resources. And so I will reserve the rest of my time. Thank you. Thank you. Your Honors, may it please the Court, Adam Kaplan on behalf of the Amici. Judge Teelberg, the record that you were referring to before talks about where the father would go in Mexico to get medicine, and that portion of the record actually supports our argument that you have to go to the hospital, because at AR 377, it says how often he would go to the hospital and that whenever he ran out of medicine is when he was reinstitutionalized to get more. Is that suggesting you have to not just go to the hospital, but you actually have to be institutionalized in the hospital to get medication? Is that what you're saying? Yes, that's correct, Your Honor. I think the record shows that the father was institutionalized for a period and he remained there and that's where he was medicated. And other areas of the record also show, Your Honor, at 539, 541 to 542, oftentimes the only doctors available to prescribe medicine are in the institutions. And people end up being institutionalized because there's insufficient access to medicine outside of the institution. I was suggesting that his brother was able to get medication in Mexico and I was citing 378. Now, maybe I misread something or I have it wrong. Yeah, I would submit, Your Honor, at lines 14 and 15, it says whenever he ran out of medication, referring to the institution. So my understanding of the record is it was not as simple as his brother going to the institution, picking up medicine for his father or his father going there and getting medicine. The record is very clear that the access to the medicine is really in the institutions and the record at 539 shows that there's no alternative for people who need psychotropic medications like petitioner than to be institutionalized. Where is that in the record, that there's no alternative? 539, 541. I'm sorry. Okay. Thank you. Well, given that only 10% or less are institutionalized, that means there's 90% or so that are unable to get medication. Is that your position? I don't think that inference can be drawn, Your Honor, because that's not accounting for the number of people who you need to. I don't think that shows the number of people who are institutionalized versus the number of people who need medication and it also doesn't account for factors like the ability to pay to get either medicine or go to a private facility or other means. I think the record shows people without means like the petitioner would need to end up institutionalized. But you see, it seems like we're in a circular argument here because Judge Gilbert pointed out the brother said he has money to buy this. So, at one point you're saying, well, that doesn't matter because if you want to get it, you're going to get institutionalized. And now you're saying, well, no, the 10% factor is not really the baseline. It's the other people could be buying their medicine. So, you can't have it both ways. Your Honors, I believe the record, there's a bit of distortion in terms of what the brother's testimony was in that he testified that he would try to give some money towards medication and the medication he's been helping with has been in the United States. And so, there's testimony about how much more expensive it is in Mexico and he did not think he would be able to cover the costs. He would need living expenses and the brother would not be able to essentially survive without medicine and without assistance. Your Honor, I see I have little time. Amici wanted to make clear, I think, very, very critical issue that's coming before this court a number of times. This case is not Viegas and there's three reasons, if I could very briefly say. The record in Viegas is not like the record here. Men, women, and children are being raped, sexually abused. There's forced sterilizations to hide the pregnancies that result. People are duct taped, tied down to their benches, left to defecate and urinate on themselves for years. People dying in restraints. People kept in cages. People forcibly lobotomized. These are not the sort of things that were before the court in Viegas. Any of that happened to the father or your client? The client? The petitioner was not institutionalized and there's not a developed record about what happened to the father. What's the longest period of time the father was institutionalized? I would need to check, Your Honor. I don't know. My understanding of the record is that there would be, the father would abuse the son. The police would be called. The father would be taken to an institution, treated, and then released. And that happened repeatedly. Is that correct? That is my understanding. And what I would say, Your Honor, is I think much more probative are recent reports from 2015, from 2013, 2010. It was decades ago, I believe, that the father was institutionalized when the petitioner was a child. And what you see now is people are detained indefinitely. They end up in institutions for decades. And the reports show that in 2010, there was a 10-year follow-up on the initial study from 2000 and they found the same people tied to the same wheelchair that they were in initially. So it's a vastly different record than Villegas. There's no effort to stop these practices. And these are medical treatment facilities. These practices have no place, no therapeutic justification. The record's clear. The Rapporteur on Torture has made that clear. Thank you, Your Honor. Thank you very much. May it please the Court. I do not mean to sound callous, but this Court has considered this basic scenario many times in the past. And the agency's denial of relief and protection here is in line with this Court's previous decisions. There's even one more case, very similar, that's in the pipeline right now. It's Sanchez and Tuenes v. Sessions, number 1670274. That's involving alleged fear of being returned to a mental hospital in Mexico. And the Court does not need to resolve the issues of whether Mexico is or is not doing enough to stop these abuses going on in institutions because substantial evidence supports denial of the petition based on this particular petitioner's individual circumstances. The Board's determination that he did not sustain past persecution. The harm itself, very severe. It's terrible what happened to him. But he did not show that the authorities were unwilling and unable to prevent the harm. The evidence is clear. The police were willing to detain his father when notified. His main argument is that because the abuse continued when his father relapsed, the police were necessarily unable to stop it. But I would respectfully submit that governments cannot be expected to provide crime-free societies as great as that would be. The petitioner suggests that the police never could have done more, such as bringing criminal charges against his father. But I would respectfully point out that did not do the mother of the petitioner's child any good. The petitioner himself was arrested for domestic violence. And he was incarcerated, convicted. And later on, he abused and was convicted of assaulting the mother of his son again. So surely the state of Washington is not unable to protect the mother of his son. So he therefore is not entitled to a presumption of a well-founded fear of future persecution. And with respect to the agency's determination that there was no nexus, assuming there was persecution, it would not be on account of a protected ground. This court decision in Mendoza-Alvarez made clear that lack of resources, medical resources that ends up resulting in abuses or harm or bad things, for lack of a better word, is not persecution on account of a protected ground. It would be wonderful if all the mental hospitals in the world had the resources of a Johns Hopkins General, but that simply is not the case. And there's just no evidence in this record that the Mexican government is specifically targeting this putative particular social group with the intention of persecuting them. So at best, it's lack of resources, apathy, lack of education. And that's just not enough under Mendoza-Alvarez. And very similar reasonings apply to this claim of Convention Against Torture. Convention Against Torture, as this court held in Villegas, is the requisite intention specific intent, which is the highest mens rea available. And just because abuses are occurring, unless there's evidence that the Mexican government actually intends to harm, and that evidence does not exist here. One thing I note is that the argument was made that this case is not like Villegas, because there's a whole series of other conditions. And I do note that Villegas is 10 years old at this point in terms of what those conditions were. Is there sufficient new evidence in the record such that Villegas doesn't really control? I would respectfully submit the only new evidence is that the Mexican government allegedly has notice of these conditions, and the argument is his children not to respond to them. Petitioner says that neither the immigration judge or my brief did not discuss the 2015 DRI report. That report, to the extent there was new evidence, it was mostly about sexual assault of a woman in shoulder and human trafficking. The stuff that Petitioner himself would potentially be subjected to, the abuses, the prolonged restraints, the over-medication, that was part of the Villegas record. That was also complained about in DRI's 2000 report, as well as the 2010 report. So I would submit that the abuses that Petitioner could potentially be subjected to, and again, for the reasons you discussed earlier, you also say that's speculative. I do not think that's new evidence. These are all problems. As you said, his claim that he will be subjected to these types of abuses is speculative. He's never been institutionalized for mental reasons. He works as a landscaper to support himself, so he potentially could find work in Mexico to offset the cost of medicine, assuming that it's available outside the institution. And he does have some familial support. There's that. The idea that he's doomed to not only be institutionalized, but also be subjected to abuses is based on speculation, and it cannot support a claim for protection under the Convention Against Torture. And so, again, it's sad. He's in unfortunate circumstances, but he has not set forth a claim for relief under the immigration laws, under the Convention Protection Against Torture. And again, if there's no other questions, I will submit on the briefs. Thank you. Mr. Romero, I think you and your counsel have more than used up your time,  Thank you, Your Honor, and I'll make it quick. I appreciate the additional time. Surely. Your Honor, I would like to just only highlight a few points. The first is the petitioner came here when he was 15 years old, and his mental health issues were triggered upon his mom's death when he was here, and that's on page 341 of the record. So he couldn't have been institutionalized in Mexico because he didn't have the symptoms of it there. The second point I wanted to make is the fact that his dad was institutionalized. A person doesn't have to be institutionalized indefinitely to face torture. They have to be there under these conditions, and so the fact that he was in there multiple times for aggressive behavior, which is one of the things that has gotten petitioner detained here, is indicative of at least a strong factor that he will at least be institutionalized, even if it's not indefinitely. It doesn't have to be indefinitely. He can be tortured in a matter of days and be released. The other point I wanted to make, Your Honor, is the ruling in petitioner's side is not inconsistent with Villegas because other petitioners also have to show that their respective countries meet the Villegas test, which is not just a mere fact of negligence and lack of resources. Thank you, Your Honor. Thank you. Thank all counsel for your argument this morning. The case of Clemente Pacheco v. Sessions is submitted.
judges: Hawkins, McKeown, Teilborg